United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MATTHEW RUIZ,
Plaintiff,

v.

SHAWN HATTON,
Defendant.

Case No. 17-cv-06706-EMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Docket No. 1

## I. INTRODUCTION

Matthew Ruiz ("Mr. Ruiz") is currently serving an 80-years-to-life sentence in Correctional Training Facility in Soledad, California. He filed this action for a writ of habeas corpus pursuant to 28 U.S.C. section 2254. Mr. Ruiz's petition is now before the Court for review on the merits. For the reasons discussed below, the Court **DENIES** the petition.

## II. BACKGROUND

A jury found Mr. Ruiz guilty of two counts of first-degree murder with special circumstances of lying in wait while committing the murders for the benefit of a criminal street gang, two counts of premeditated attempted first-degree murder, and found several associated firearm and gang enhancement allegations true. The California Court of Appeal heard his appeal twice (2015 and 2016)—the second time after remand from the California Supreme Court in light of *People v. Franklin*, 63 Cal. 4th 261 (2016). Mr. Ruiz argues he is entitled to habeas corpus relief.

### A. Factual Background

The California Court of Appeal described the evidence presented at trial:

On October 14, 2009, at approximately 4:30 p.m., 16-year-old Edgar and his cousin Alejandro, who at the time was 23 years old, walked to the "One-Two-Seven Market" to buy groceries for their grandmother. At trial, Edgar denied being a Sureño, but he did admit that he associated with them. Alejandro admitted associating with Sureños and said that he had been shot at three different times. Just after Edgar and Alejandro entered the market, two people they did not know came into the market. One of the people wore a hat. After Alejandro bought the groceries, he and Edgar left the store and began to walk home. The two people from the store followed them and asked if they "banged." Edgar said he was a Sureño and Alejandro said he was a "South Sider." The two people claimed that they were "Southerners."

At some point as they were walking on Elkington Street, a grey Honda sedan pulled up next to Edgar, Alejandro, and the two people from the store. Edgar knew the driver, Juan, and his two backseat passengers, Ociel and Rodolfo. Alejandro knew one of the backseat passengers as "Moskua" and knew Ociel as "Tweak." The occupants of the Honda said they had just been in a fight with some Norteños; and they had found some Northerners at La Paz Park. They invited Edgar and Alejandro to join them to get revenge. Edgar said he could not go because he had to take the groceries back to his grandmother. The two people from the store volunteered to go with the occupants of the Honda. They got into the car.

Juan testified that on October 14, 2009, he was approximately 16 years old. Juan did not have a driver's license, but around 2:00 or 3:00 p.m. on October 14, he took his father's Honda to pick up three friends—Christian, Ociel, and Rodolfo. Christian, who was 15 years old in October 2009, testified that he had been associating with Sureños for approximately two years. On October 14, he sat in the front seat of the Honda and Ociel and Rodolfo sat in the back.

Juan said that he drove to Elkington Street to pick up a friend, but his friend was not at home. While he was driving on Elkington, Juan saw his friend Alejandro with Edgar[1] and two other people. Juan stopped the car and someone mentioned to Alejandro and the others that they were going to fight Norteños. Christian invited Edgar and Alejandro to join them but they said no. Instead, the two other people said they were Vagos members, a Sureño gang; they got into the car. One of the people was wearing a black hat with a yellow colored letter "P" and black and white baseball gloves. According to Christian, many Sureños wear Pittsburgh Pirates hats.

Juan drove the group back to the park to confront the Norteños they had seen earlier. They saw a group of approximately eight people at the park; Juan and his friends thought they were Norteños. Everyone got out of the Honda. The two strangers walked ahead and approached the group. They pushed the suspected Norteños, who left immediately. Everyone returned to the Honda. The two strangers sat in the back behind the driver's seat. The one with the

[1] Alejandro thought Edgar was Alejandro's brother.

hat sat by the door and the one without the hat sat to his right next to Ociel. Juan drove and Christian sat in the front passenger seat. Rodolfo sat on the floor behind Christian.

Eventually, after driving around looking for Norteños unsuccessfully, one of the strangers directed Christian to go to Archer Street because that was where he lived. Christian told Juan to drive to Archer Street, which he did; he parked near some apartments. After parking the car, Juan looked in his rearview mirror and saw a gun pointed at his head. Juan testified that he could not see who was holding the gun, but he conceded that after the incident he had told an officer that the person with the hat shot him and that this person was wearing gloves. Juan explained that he said it was the person with the hat because the person with the hat was seated closest to him. Juan heard one gunshot and lost consciousness; he had been shot in the head. Juan was in the hospital for five to seven days. As a result of the gunshot wound he lost some hearing in his right ear. The parties stipulated that Juan suffered a gunshot wound to the head with a hemorrhagic contusion of the right temporal lobe.

Christian testified that as Juan stopped the car on Archer Street, one of the guys said, "Do you want to see my gun?" Then he heard gunshots and "the one without the hat" shot him in the neck. Christian said that he did not hear any gunshots after he was shot. As a result of the gunshot wound Christian is paralyzed from the neck down. Both Ociel and Rodolfo were shot multiple times; both died.

On October 29, the police showed Edgar and Alejandro photographic lineups. Edgar identified Hernandez's photograph as depicting one of the two people from the market. Alejandro identified Ruiz's photograph as depicting the person wearing the hat. Alejandro described Hernandez as the one who "hit him up." At trial, Alejandro identified Ruiz as the person with the hat and Hernandez as the other person. The person with the hat said his name was "Slow Poke" and that he was from the Vagos gang.

At trial, Edgar and Alejandro identified Ruiz as the person who had been wearing the hat and Hernandez as the other person. Similarly, in court Juan identified Ruiz and Hernandez as the two people who got into the Honda; he identified Ruiz as the one who was wearing the hat.[2] Alejandro testified that one of the people from the market was wearing a glove on his left hand.

[2] Approximately two weeks after the shooting, Salinas Police Officer Goodwin showed Juan a photographic lineup that included Hernandez's photograph. Juan's eyes grew wide and his body grew tense when he saw Hernandez's photograph. However, Juan stated that the person in the photograph looked similar to one of the two people but was not one of them. Officer Goodwin visited Christian at the hospital and showed him two photographic lineups. Christian identified Ruiz as the person with the hat who got into the Honda. Christian identified Hernandez as the person who shot him. Christian told Officer Goodwin that he saw only Hernandez with a gun and that the gun was black and grey. Christian said that he was the first person shot and after he was shot he heard more shots. Christian confirmed that Ruiz sat behind Juan in the Honda.

Robert, who worked as a communications training officer for the Presidio of Monterey Police was driving on Archer Street when he noticed a grey Honda sedan driving slowly and abruptly stopping and moving again. Robert saw two or three bright flashes of light and heard muffled gunshots. The Honda lurched forward. Robert saw two people get out of the Honda. Both appeared to be 20 to 25 years old. The first person wore a dark baseball cap that was turned backward, and he held his hands inside the pocket of a dark "hoodie" he was wearing. The second person was not wearing anything on his head. This person ran into the first person and pushed him; they both stumbled, but caught their balance. They ran into a nearby alley. Robert telephoned 911.[3]

Various witnesses testified that they saw two people running through backyards and going over fences. According to one witness, both people wore black hooded sweatshirts and one wore a black baseball hat with a gold emblem. One of the people stopped momentarily as if he had dropped something or was looking for something before he jumped over a fence. Another witness discovered a black baseball cap and gloves in his yard after the men ran through. Two of the witnesses thought that the people were in their 20's.[4]

Salinas Police Officer Richard Diaz[5] arrived on Archer Street to see a Honda sedan parked by a fallen tree branch. All four doors to the Honda were open. Officer Diaz asked the driver (Juan) who had shot him, but Juan responded that he did not know and that he did not speak English. Officer Diaz found Rodolfo in the back of the Honda lying across the floor with a gunshot wound to his head; part of Rodolfo's brain was exposed. Ociel was in the back on the seat; he had suffered a gunshot wound to his head; he was unconscious and barely breathing. Christian was in the front seat and had suffered a wound to the left side of his neck—he too was

---

[3] Robert identified Ruiz and Hernandez in court, but he thought that Hernandez was the one wearing the hat and Ruiz was the second man to get out of the Honda. On October 29, when Officer Goodwin showed Robert a photographic lineup that included Hernandez's photograph, initially Robert set aside Hernandez's photograph and selected someone else as one of the suspects. However, when another officer showed Robert a photographic lineup that included a photograph of Ruiz, initially Robert set aside the photograph with all the others, but after going through the photographs a second time he pulled out Ruiz's photograph and said that if the man were wearing a baseball hat backward then it would be the man he saw get out of the Honda first. Salinas Police Officer Kim Robinson confirmed that when she spoke to Robert at the scene, he told her he had witnessed the shooting; that he heard several muffled pops that sounded similar to gunfire; that the front and rear driver's doors opened and two men got out of the rear of the Honda; that the second man to get out pushed the first; that Robert described the men as 20 to 25 years old; that one had curly black hair and wore a black sweatshirt and a black and white baseball cap; that the other was a heavier build with a shaved head; and both kept one hand inside their sweatshirts as if they were trying to conceal something.

[4] At the time of the shooting Ruiz was 17 years, 8 months old, and Hernandez was seven days away from his 17th birthday.

[5] All further references to officers in this case are to Salinas Police Department officers unless noted otherwise.

United States District Court
Northern District of California

unconscious and barely breathing.

From the backyard of 791 Archer Street, officers recovered a black baseball cap with the letter "P" on it along with a pair of black and white gloves.

On October 16, 2009, forensic pathologist Dr. John Hain performed the autopsy of 14-year-old Rodolfo. Rodolfo was five feet tall and weighed 93 pounds. Dr. Hain opined that the cause of Rodolfo's death was two gunshot wounds to the head. Based on the gunshot residue on Rodolfo's hood, Dr. Hain concluded that Rodolfo had been shot twice in the head from less than one foot away, once from above and once to the left of his head. Two bullets had entered his upper left forehead just inside the hairline. One bullet passed through his skull and his brain. It was recovered from his pharynx area. The second bullet was recovered from Rodolfo's stomach, which meant that he had swallowed it. The bullets that were recovered were partially fragmented. Rodolfo had gun powder burns on the back of his hand. He had a tattoo of three dots on his elbow.

Dr. Hain's autopsy of 14-year-old Ociel revealed that he was five feet three and a half inches tall and weighed 156 pounds. The cause of his death was multiple gunshot wounds. Ociel had been seated on the right side of the back seat when he was shot three or four times. One bullet entered the scalp area of the top of his head; one entered the center of his head; one bullet entered his left earlobe and passed through his ear, leaving shrapnel wounds on his left cheek; and one bullet entered and exited his left shoulder. Based on the gunpowder stippling and burns to Ociel's left shoulder, Dr. Hain concluded that Ociel had been shot in the shoulder from inches away. There were plastic and copper jackets in the wound tracks. Dr. Hain recovered bullet fragments from Ociel's body. Dr. Hain located plastic material in a track wound, which he said "most likely" came from a hollow-point bullet. Ociel had gunpowder stippling along his wrist and gunpowder burns on his right thumb. Dr. Hain recovered a .38-caliber bullet slug from the right thumb. The bullet fragments removed from Rodolfo and Ociel were jacketed.

Five .380-caliber shell casings were located at the scene.[6] Criminalist Sara Yoshida examined the shell casings and determined that they were .380-caliber and that they had all been fired from the same semi-automatic firearm. However, she testified that it was not possible to reach a conclusion about some bullet fragments that she had received. She was able to determine that all the bullets and fragments she was able to examine were called "Pow'rBall," which meant that there was a small plastic ball inside. Yoshida explained that no manufacturer made copper-jacketed bullets or Pow'rBall bullets capable of being fired from a .38-caliber Smith and Wesson revolver. Yoshida did not examine the bullet from Juan's wound and she did not examine the bullet from Christian.

[6] The prosecutor referred to a sixth casing found at the scene, but Officer Rios corrected the prosecutor, telling him that the casing corresponded to the sixth placard placed at the scene.

In 2009, Officer Brian Canaday[7] reviewed surveillance video from the market and saw one of the two suspects holding a bag of chips. Officer Ruben Sanchez, a school resource officer, recognized Hernandez from the video, as did Monterey County Probation Officer (P.O.) Derek Rager, who had supervised Hernandez. Initially, officers recovered clothing from the Honda and two cellular telephones, both of which had blue wallpaper associated with Sureños. A second search of the Honda revealed a chip bag on the floorboard. Officer Canaday asked then Officer Brian Johnson to process the bag for fingerprints.[8] Using the fuming process, Officer Johnson was able to lift a latent fingerprint from the bag. The hat with the letter "P" was processed; it had a low-quality fingerprint.

Latent fingerprint examiner Gayle Graves examined the print from the chip bag. She compared the print to a print from Hernandez's right thumb. Using eight points of comparison, she concluded that the print on the chip bag came from Hernandez.

Senior criminalist Christopher Tanforan examined the baseball cap and gloves recovered from behind the Archer Street apartment complex. The DNA from three to five people was present on the gloves' interior, but Ruiz was the major contributor.

When Ruiz and Hernandez were arrested, officers seized their cellular telephones. Wireless expert Jim Cook evaluated the cellular telephone records for the two phones and determined that Ruiz's telephone and Hernandez's telephone[9] had exchanged calls and texts on October 14. Cook concluded that the cellular telephone activity showed that Ruiz's telephone went from 225 Maryal in Salinas to the market, then to 777 Archer Street at 5:37 p.m. on October 14.

On the day of their arrest, Ruiz and Hernandez were placed in the same patrol car for transportation to the jail. Their conversation was recorded. Officer Josh Lynd explained that at times they whispered to each other. A recording of the conversation was played for the jury. Officer Lynd testified that after being put into the car, someone said, "I didn't say shit."[10] Then one of them commented, "Don't tell anybody. Don't tell your attorney. Don't tell anybody." One of them said, "Hopefully, they don't have enough evidence" and that "Hopefully we'll be out in a month or two."

[Section describing evidence of Hernandez's gang affiliation removed.]

---

[7] At the time of trial, Officer Canaday worked in the Kern County District Attorney's Office. In 2009, he was a detective in the Salinas Police Department.

[8] By the time of trial Officer Johnson was a detective.

[9] Mr. Cook testified about the cellular phone activity on October 14, but conceded that he could not determine who possessed the telephones on that day.

[10] Officer Lynd testified that when he listened to the recording he was not able to distinguish between the two voices.

*Evidence of Ruiz's Gang Affiliation*

On April 28, 2006, Officer Adolfo Lopez was investigating a battery report at a community school when he was given a piece of paper by a probation officer. He testified that the paper had been confiscated from Ruiz by one of the teachers. The paper contained gang writing, which Ruiz admitted he and his friends had written. The symbols were associated with Norteños. Among the writings was the number “3”; it had been crossed out and the numbers “10” and “4” were below it. Officer Lopez asked Ruiz if he was associated with a gang. Initially, Ruiz said no, but when Officer Lopez asked Ruiz if it would be okay for him to be lodged with Southerners at juvenile hall, Ruiz said no. Ruiz explained that Southerners disrespect Northerners.

On September 30, 2008, Officer Jeff Alford stopped a car being driven by Ruiz's mother. Ruiz was sitting in the front passenger seat. Officer Alford asked Ruiz to get out of the car. Officer Alford testified that he recognized other people in the car as Norteño gang members. One of them, Lachuga, tried to run when Officer Alford asked him to get out of the car; he was found to have a handgun in his pocket. When the officer searched the car, he found a .22-caliber handgun under the front passenger seat where Ruiz had been sitting. Officer Danny Warner placed Ruiz in the back seat of a patrol car. The officer remained with Ruiz while Ruiz was in the car. At one point another officer came over to tell Officer Warner that two guns had been located and that one had been found underneath the front passenger seat. Ruiz said, “That's mine.”

A photograph taken of Ruiz on September 30, 2008, showed that Ruiz had a tattoo of the name “Valerie” on his arm. Valerie is his mother's name. Ruiz had a tattoo of “Ruiz” on the back of his neck. Officer Alford could not recall Ruiz's having any other tattoos at that time.

On October 29, 2009, Officer Arlene Currier searched Ruiz's residence. A search of a bedroom that had letters addressed to Ruiz in a dresser yielded a banner with San Francisco 49ers on it, a wood block with “500 block” engraved on it, Reebok shoes and baseball hats, a black T-shirt and black hoodies, a black T-shirt with a gang slogan, and photographs of Ruiz with known gang members and people flashing gang signs. A loaded revolver was found in his dresser drawer.

During his jail intake interview, Ruiz told Monterey County Sheriff's Deputy Reed Fisher that he was affiliated with the Norteños. According to Deputy Fisher, Ruiz indicated that his opposition gang was the Sureño gang.

*Gang Expert Testimony*

Officer Masahiro Yoneda, a Violence Suppression Unit Gang Intelligence Officer, testified as an expert on gang activity in the City of Salinas. Officer Yoneda explained that the Norteños and the Sureños are rivals that commit violent acts against each other. Each

United States District Court
Northern District of California

gang has between 1,500 and 2,000 members in the Salinas area. The Norteños identify with the number 14, the North Star, San Francisco Giants clothing, San Francisco 49ers clothing, and the color red. The Salinas East Market gang uses the letters SEM and the number 500, which represents the 500 block of East Market Street—viewed by members as the birthplace of the gang. Sureños identify with the number 13, the Los Angeles Dodgers, "Southpole gear" and the color blue. Officer Yoneda explained that a gang member receives greater respect from within the gang the longer he is a member and the more serious and numerous the crimes he commits. Perceived disrespect by a rival gang member often ends up setting off a chain of events starting with either a violent assault or a shooting or homicide; the gang that receives that violent act then has to retaliate.

[Section describing evidence of Hernandez's gang affiliation removed.]

Officer Yoneda opined that Ruiz was an active Norteño gang member at the time of the shooting. Again, he based his opinion on numerous factors, including Ruiz's contacts with the Salinas police for gang-related criminal activity; the jail intake screening questionnaire; Ruiz's association with known gang members; Ruiz's tattoo of "500" acquired after the shooting, which indicated to Officer Yoneda that Ruiz was advertising the fact that he committed a crime; other tattoos he acquired of the number 4 and XIV; the gang indicia found in Ruiz's residence including a red T-shirt with the words "Cali" and a black Huelga bird; photographs of Ruiz in which he appeared to be "throwing an M" with his left hand; and photographs of other people in which they were throwing gang signs.

Officer Yoneda opined that if two Norteños posed as Sureños and got into a car occupied by four Sureños and they killed two of the Sureños and tried to kill the other two, the crime would have been committed for the benefit of the Norteño street gang. He explained that "it enhances the reputation of the gang when members of that gang commit violent crimes against the other gang." Officer Yoneda had not previously heard of a Norteño posing as a Sureño to obtain a gang advantage.[11]

The parties stipulated that the Norteños are a criminal street gang within the meaning of section 186.22, subdivision (f) in that it is an ongoing organization of three or more people; that it is both formal and informal; that one of its primary activities is the commission of criminal acts including homicides, assault with a deadly weapon, and possession of concealed firearms; that the Norteños have a common name and symbol; and that the members engage in a pattern of criminal activity. The parties further stipulated that photographs of Ruiz and Hernandez taken of them in jail three years after the shooting showed new gang-related tattoos.

*People v. Ruiz*, 2016 WL 6996269, at *2–9 (2016) (footnotes in original).

[11] The police had initially investigated the shooting as a Sureño–on–Sureño crime.

United States District Court
Northern District of California

United States District Court
Northern District of California

B. Procedural Background

Following a jury trial in Monterey County Superior Court in 2013, Mr. Ruiz was convicted of two counts of first-degree murder with special circumstances of lying in wait and committing the murders for the benefit of a criminal street gang (Cal. Penal Code §§ 187, 190.2(a)(15) & (22)) and two counts of premeditated attempted first-degree murder (Cal. Penal Code §§ 664/187). 2 CT 442–55, 471–73. The jury also found several associated firearm and gang enhancement allegations true. He received a total sentence of 80 years to life in state prison. 3 CT at 816–17.

Mr. Ruiz appealed. The California Court of Appeal affirmed his conviction and denied his petition for rehearing. Respondent's Memo to Answer to Order to Show Cause ("Answer"), Exs. 8, 10. The California Supreme Court granted Mr. Ruiz's petition for review but deferred considering the appeal pending its decision of *People v. Franklin*, 63 Cal. 4th 261 (2016).[12] *Id*., Ex. 12.

The California Supreme Court later remanded the decision to the California Court of Appeal for reconsideration in light of *People v. Franklin*, 63 Cal. 4th 261 (2016). *Id*., Ex. 13. The California Court of Appeal affirmed the judgment on the same grounds as previously held, but it reversed and remanded the matter to the trial court to determine whether a record—as it related to the *Franklin* decision—had been made. *Id*., Ex. 16. Mr. Ruiz did not petition the California Supreme Court for review a second time.

Mr. Ruiz then filed this action to obtain a federal writ of habeas corpus, alleging the following grounds for relief: (1) a sentence of 80 years to life for a crime committed as a juvenile violates the Eighth Amendment; (2) the trial court violated his Fifth Amendment rights when it admitted statements taken for jail-classification purposes; (3) the trial court violated his due

[12] In *Miller v. California* (2012) 567 U.S. 460, the Supreme Court held that a mandatory life sentence without the possibility of parole ("LWOP") imposed on a minor violates the Eighth Amendment, but such a sentence is permissible if it is discretionary and the sentencing court considers certain relevant and mitigating circumstances. But in *People v. Franklin*, the California Supreme Court held that a *de facto* LWOP sentence imposed on a person under the age of eighteen at the time of the offense did not violate the Eighth Amendment because of the prospect of early parole consideration mandated by California Penal Code section 3051. A remand to the sentencing court was nevertheless necessary to develop a record for consideration of youth-related *Miller* factors at future parole hearings. 63 Cal. 4th at 287.

process rights when it admitted evidence of firearms found at his home and during a prior traffic stop, both of which were unrelated to his charged offense; (4) admissions of co-defendant statements, recorded in the patrol car, violated the Confrontation Clause; and (5) cumulative error in violated his due process rights.

## III. JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this action for a writ of habeas corpus. *See* 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person in Monterey, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## IV. STANDARD OF REVIEW

The Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### A. State Court Exhaustion

An individual must exhaust state remedies before seeking federal habeas relief. 28 U.S.C § 2554(b)(1)(A). "A petition has satisfied the exhaustion requirement (1) if he has 'fairly presented' his federal claim to the highest court with jurisdiction to consider it, or (2) he demonstrates that no state remedy remains available." *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996) (citations omitted). "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in courts of the State." 28 U.S.C. § 2254(b)(2).

### B. Merits of the Petition

The Antiterrorism And Effective Death Penalty Act of 19396 ("AEDPA") amended Section 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

The state-court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991). "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Id.* at 803.

## V. DISCUSSION

### A. Exhaustion of Claims

The Parties agree that this petition is timely, and that three out of four claims are exhausted. Memo in Support of Petition for Writ of Habeas Corpus ("Pet.") at 2; Answer at 2. However, there is a dispute as to whether Mr. Ruiz exhausted his Eighth Amendment claim. *Compare* Answer at 10; *with* Petitioner's Traverse to Answer to Petition for Writ of Habeas Corpus ("Traverse") at 2.

### B. 80-Years-To-Life Sentence For a Juvenile Offender

Mr. Ruiz contends he presented all his claims to the California Supreme Court on November 2, 2015, thereby exhausting his state remedies. Pet. at 2. Notwithstanding the issue of

United States District Court
Northern District of California

exhaustion, the Court finds Mr. Ruiz's Eighth Amendment claim meritless for the reasons discussed below. *See Gutierrez v. Griggs*, 695 F.2d 1195, 1197–98 (9th Cir. 1983) (holding that district court need not consider exhaustion where claim is plainly non-cognizable); *see also Cassett v. Stewart*, 406 F.3d 614, 623–24 (9th Cir. 2005) (finding no need to consider exhaustion requirement where petitioner "does not raise even a colorable federal claim").

1. Trial Court Proceedings

At sentencing in Monterey County Superior Court, the trial judge sentenced Mr. Ruiz to two concurrent 50-to-life sentences for the two murders while being "mindful of and of avoiding the functional equivalent of an LWOP sentence . . . ." RT 9963. The judge also imposed two 15-to-life sentences for the two attempted murders to run consecutive with the 50-to-life sentence, which totaled to 80 years to life in prison. *Id*.

2. Appellate Court Opinion(s)

On appeal, Mr. Ruiz argued that his sentence was a *de facto* LWOP sentence. The California Court of Appeal analyzed this argument twice—in 2015 and in 2016. In 2016, the court had the benefit of the state high court's opinion in *People v. Franklin*.

Both times, the Court of Appeal looked to U.S. Supreme Court precedent as well as California Supreme Court precedent. The court recognized that precedent "may be read to prohibit imposition of a mandatory LWOP sentence or its functional equivalent on any juvenile homicide or nonhomicide offender, without first considering the factors *Miller* [*v. Alabama*, 567 U.S. 460 (2012)] found relevant to punishment." *People v. Ruiz*, 2015 WL 5725255, at *18 (2015). But, the court held that Mr. Ruiz's sentence did not violate the Eighth Amendment because the record "demonstrate[d] that the trial court undertook a careful review and considered the relevant circumstances of [Mr.] Ruiz's status as a juvenile when it sentenced him to the maximum term of imprisonment—80 years to life—by running all the sentences on each count and enhancement consecutively. [Mr.] Ruiz received the individualized sentencing discretion from the trial court as mandated by *Miller*." *Id*.

On remand from the California Supreme Court in light of *Franklin*, the Court of Appeal held that Mr. Ruiz's Eighth Amendment challenge to his sentence was rendered moot by the

United States District Court
Northern District of California

passage of SB 260, which added Section 3051 to the Penal Code. *Ruiz*, 2016 WL 6996269, at *20. Section 3051 makes a youth offender eligible for a parole hearing during the twenty-fifth year of his or her sentence. The Court of Appeal concluded that because Mr. Ruiz now had a "meaningful opportunity for release during his 25th year of incarceration," his Eighth Amendment challenge was moot. *Id*. (citing *Franklin*, 63 Cal. 4th at p. 280).

3. Analysis of Eighth Amendment Claim

Mr. Ruiz's petition argues that the Court of Appeal's decision to uphold his sentence was an unreasonable application of clearly established law. Pet. at 7. In so doing, Mr. Ruiz's acknowledges that the sentencing court did, in fact, reject a sentence of life without the possibility of parole when it imposed an 80-years-to-life sentence. *Id*. But he contends this sentence is still a clear violation of the Eighth Amendment's ban on cruel and unusual punishment because it is a functional equivalent of a life sentence without parole. *Id*. According to Mr. Ruiz, because of the judicially noticed Centers for Disease Control National Vital Statistics Report that predicts he would live between the age of 59.5 and 64.3 years old, his sentence does not provide him with a meaningful opportunity of release, as required by the Supreme Court's decision in *Miller*. *Id*. at 8. Mr. Ruiz's position is that this is a clear violation of Supreme Court precedent.

The Supreme Court has ruled on juvenile punishment on many occasions. In *Graham v. Florida*, 560 U.S. 48, 75 (2010), the Court held that the Eighth Amendment categorically bans the imposition of a sentence to life without parole on a nonhomicide juvenile offender. Next, in *Miller*, the Court held that a LWOP sentence cannot be mandatory, but such a sentence is permissible if it is discretionary and the sentencing court considers certain relevant and mitigating circumstances. 567 U.S. at 489.

Following the Supreme Court's decision in *Graham* and *Miller*, the California Supreme Court held that a state must provide a juvenile offender with some realistic opportunity to obtain release from prison during his or her expected lifetime. *People v. Caballero*, 55 Cal. 4th 262, 267, (2012). The *Cabellero* court concluded that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth

Amendment." *Id*. at 269. As stated above, the California Supreme Court subsequently held that an individual's Eighth Amendment challenge to a functional equivalent LWOP sentence was mooted by California Penal Code section 3051. *Franklin*, 63 Cal. 4th at p. 280 (SB 260 was intended "to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*.").

Mr. Ruiz argues that, despite this, Section 3051's ability to allow him to see a parole board on his twenty-fifth year in prison does not convert his *de facto* LWOP constitutional under the Eighth Amendment because the California Legislature can repeal it at any time. Pet. at 9. However, because habeas relief relies on state court errors that are contrary to clearly established Supreme Court precedent, Mr. Ruiz's argument that Section 3051 may—someday—be repealed is inapposite. Even if the state legislature repeals Section 3051's twenty-fifth year mandatory parole hearing, the Supreme Court (unlike the California Supreme Court) has not extended its holding in *Miller* to sentences that have the functional equivalent of a LWOP sentence. *See Lockyer v. Andrade*, 538 U.S. 63, 73–74 (2003) (two consecutive terms of 25 years to life was "materially []distinguishable" from a life-without-parole term because the petitioner actually "retain[ed] the possibility of parole."); *see also United States v. Grant*, 887 F.3d 131 (3d Cir.), *reh'g en banc granted, opinion vacated*, 905 F.3d 285 (3d Cir. 2018). In short, there is no clearly established U.S. Supreme Court precedent recognizing the unconstitutionality of a de facto LWOP sentence from which Mr. Ruiz can seek habeas relief.

Accordingly, Mr. Ruiz's 80-years-to-life sentence for the crime he committed as a juvenile offender does not violate clearly established Supreme Court precedent, nor did it violate *Miller* because the trial court exercised discretion by considering Mr. Ruiz's mitigating factors (his youth). *See Demirdjian v. Gipson*, 832 F.3d 1060, 1077 (9th Cir. 2016) (citing *Lockyer v. Andrade*, 538 U.S. 63, 73–74 (2003)).

C. Admission of Statements Made for Jail-Classification Purposes

1. Trial Court Proceedings

Prior to trial, the court held a hearing out of the presence of the jury to determine the admissibility of Mr. Ruiz's self-incriminating statements made during the booking process. *Ruiz*, 2016 WL 6996269, at *9. At the time, Mr. Ruiz was unable to convince the trial court that the

statements violated his Fifth Amendment rights. *Id*. During trial, the prosecution called Officer Fisher to testify about the statements Mr. Ruiz to him made during jail intake. RT 7609–12. Officer Fisher testified that Mr. Ruiz indicated he was affiliated to the Norteños gang, whose enemies are the Sureño Gang. *Id*. at 7612. Officer Yoneda, the gang expert witness who testified at trial for the prosecution, used this testimony in his analysis to conclude that Mr. Ruiz was an active Norteños gang member. RT 8027–28.

2. Appellate Court Opinion

Mr. Ruiz appealed, arguing that the admission of his jail-classification statements violated his Fifth Amendment privilege against self-incrimination. *Ruiz*, 2016 WL 6996269, at *9. The California Court of Appeal recognized that, while Mr. Ruiz's appeal was pending in 2015, the California Supreme Court decided *People v. Elizalde*, 61 Cal. 4th 523 (2015), which held that classification interviews regarding gang affiliation during a defendant's booking process constitute custodial interrogation for purposes of Fifth Amendment self-incrimination. *Id*. The Court of Appeal agreed with Mr. Ruiz that the admission of Officer Fisher's testimony violated his *Miranda*[13] rights. *Id*. at 18. However, the court held the admission was harmless because the prosecution satisfied its burden in showing that the testimony did not contribute to the verdict—*i.e.*, there still existed overwhelming evidence that established Mr. Ruiz's gang membership. *Id*. at *10. The Court of Appeal held that because Mr. Ruiz's gang affiliation was amply established by independent and uncontradicted evidence, the erroneous admission of his self-incriminating statements was harmless beyond a reasonable doubt. *Id*.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which Section 2254(d) is applied when analyzing habeas relief. *See Wilson*, 138 S. Ct. at 1192. Mr. Ruiz is entitled to habeas relief only if the Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established Federal law from the Supreme Court, or was based on an unreasonable determination of the facts considering the evidence presented.

[13] *Miranda v. Arizona*, 384 U.S. 436 (1996).

United States District Court
Northern District of California

3. Analysis of Fifth Amendment Claim

Mr. Ruiz argues that the state court's determination of harmless error was an unreasonable application of *Chapman v. California*, 386 U.S. 18, 24 (1967) and an unreasonable determination of the facts considering the evidence presented at trial. Pet. at 13. Correspondingly, Mr. Ruiz further contends that the error had a "substantial and injurious effect or influence in determining the jury's verdict" under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *Id*.

"The test for whether a federal constitutional error was harmless depends on the procedural posture of the case." *Davis v. Ayala*, 135 S. Ct. 2187, 2197–98 (2015). On direct appeal, the harmlessness standard is the one prescribed in *Chapman*, 386 U.S. 18. Under *Chapman*, the erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the beyond a reasonable doubt standard, which requires the prosecution to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. 386 U.S. at 24.

But in a collateral proceeding, such as here, the test is different because of the notions of finality, comity, and federalism—habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637. Under this test, relief is proper only if the federal court finds the trial error had a "substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995); *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008) (review for harmless error under *Brecht* is "more forgiving" to state court errors than the harmless error standard the Supreme Court applies on direct review of state court convictions).

The California Court of Appeal relied on the record when it found the error to be harmless under the *Chapman* test. The court reasoned that the prosecution's case was strong in the absence of the erroneously admitted statements due to the following regarding his identify as the triggerman and gang membership:

> Juan identified Ruiz as the person in the back of the Honda who was wearing a hat; he told Officer Larkin that it was this person who shot him and that he was wearing gloves. Ruiz's DNA was found in the glove discarded after the shooting. Robert identified Ruiz as the person who was wearing the hat that got out of the back of the

> Honda after the shooting. The surveillance video from the market confirmed Ruiz's identity. Alejandro identified Ruiz's photograph as depicting the person wearing the hat that was in the market and he identified him in court as the person wearing the hat. The hat Ruiz was seen wearing in the market video was recovered from an Archer Street backyard.

2015 WL 5725255, at *12. Additionally, the court determined that

> Ruiz's gang membership was convincingly established by other evidence, including Ruiz's contacts with the Salinas police for gang-related criminal activity; Ruiz's association with known gang members; the gang indicia found in Ruiz's residence, including a red T-shirt with the words "Cali" and a black Huelga bird, the wood block with "500 block" engraved on it, and photographs of Ruiz in which he appears to be "throwing an M" with his left hand; and photographs of other people in which they are throwing gang signs, which were found in his room.
>
> This evidence is sufficient to support a finding that Ruiz was a Norteño gang member when the crimes in this case were committed. When considered with the aforementioned evidence, Ruiz's acquisition of gang-related tattoos after the crimes were committed and while he was incarcerated provided additional evidence of his gang affiliation.

*Ruiz*, 2016 WL 6996269, at *9.

At trial, Mr. Ruiz's jail-classification statements went towards his membership with the Norteño street gang. Here, he argues that the *sin quo non* of the prosecution's case was his gang membership. Pet. at 11 ("[i]t was the prosecution's theory that the crimes were committed by gang members for a gang purpose, so evidence of the defendants' gang association bolstered the prosecution's case as a whole."). The record had a wide range of evidence regarding Mr. Ruiz's affiliation with a criminal street gang: Mr. Ruiz's gang-related tattoos; gang paraphernalia found at his home; his history with the Salinas police department for gang-related activity; and his association with known Norteño gang members.[14] *Ruiz*, 2015 WL 5725255, at *7 (2015). The gang expert testifying to Mr. Ruiz's gang affiliation relied on all the foregoing. *Id*. at 8. As such, the admission of Mr. Ruiz's jail-classification statements confirming his gang membership was not critical to the gang expert's analysis or the prosecution's success.

---

[14] Mr. Ruiz's own attorney conceded gang affiliation. *See* RT 8519 ("To say that Matt Ruiz is not involved or associated with a gang, I would be run out of the courtroom if I said that here. It's obvious as he sits there. It just is."); *see also* RT 8522 ("my client does have a lot of tattoos. And there's no question that he's associated with a gang.").

Mr. Ruiz accuses the prosecution's case of relying on "confused and contradictory testimony" from witnesses regarding his identification and claims that "[i]dentifying petitioner as a committed Norteño was valuable to the prosecution because it would supplement the identification evidence and increase the likelihood that the jury, unsettled by the *mass of alarming gang evidence*, would decide that petitioner intended to kill Sureños for the benefit of the Norteños." Pet. at 12. (emphasis added). His own argument indicates that there was a legion of gang evidence against him. Mr. Ruiz has not shown how the inclusion of a jail-classification statement would have resulted in a different outcome by the jury despite the remaining gang evidence. His membership with the Norteño gang was well-established through other means. Because the jail-intake statements constituted a small portion of the gang-related evidence against Mr. Ruiz, the state court's holding that the admission of self-incriminating statements was harmless error does not violate the *Brecht* or *Chapman* test. *See also United States v. Padilla*, 387 F.3d 1087, 1094 (9th Cir. 2004) (harmless error beyond a reasonable doubt when the court is satisfied that the jury's verdict would have been the same had inadmissible statement been excluded).

As such, the Court of Appeal did not apply the *Chapman* test in an objectively unreasonable manner. The erroneously admitted statements regarding Mr. Ruiz's gang membership did not have a "substantial and injurious effect or influence in determining the jury's verdict," as required for habeas relief under *Brecht*.

D. Admission of Unrelated Firearms Evidence

1. Trial Court Proceedings

During trial, Mr. Ruiz filed a motion in limine to exclude evidence of a firearm found in his home as well as evidence of a firearm found during a traffic stop a year prior to the crime. *See* RT 5745–57. Both, he argues, were unrelated to his charged offense. *Id*. Mr. Ruiz contends that the firearm found in his house could not have produced any of the ballistics evidence that was recovered from the scene of the shooting, which made the evidence far more prejudicial than probative. *Id.* Regarding the firearm found in the car, Mr. Ruiz argued that it was prejudicially cumulative of other evidence associating him with a gang and, therefore, its probative value was

low. *Id.* The prosecution argued that the firearm found in Mr. Ruiz's home was relevant because of the possibility that a second firearm was used. *Id.*

The court ruled that the evidence of the firearm found in Mr. Ruiz's home was admissible because the prosecution had made a reasonable showing that a second firearm could have been associated with the crimes due to conflicting testimony as to who shot whom—*i.e.*, there could have been multiple shooters. As to admitting the photograph of the firearm found in the 2008 traffic stop, the court found it relevant to establish Mr. Ruiz's gang connections, which was an element the prosecution sought to prove. *Ruiz*, 2015 WL 5725255, at *9–10.

2. <u>Appellate Court Opinion</u>

The California Court of Appeal recognized that evidence regarding possession of a weapon that was not used in the charged crime is irrelevant to the determination of guilt or innocence. *Id*. at 10. However, it may be admissible when it is relevant for other purposes. *Id.* The Court of Appeal viewed the evidence at trial and held that the prosecution created a reasonable inference that more than one gun was used.[15] There were also discrepancies as to the number of bullet-shell casings found at the scene compared to the number of bullets found lodged in the victims' bodies. *Id.* at 11. The court held that it "may be permissible to admit into evidence weapons found in the defendant's possession sometime after the crime that could have been the weapons employed." *Id*. On this point, the Court of Appeal held that the trial court did not commit error in admitting evidence of the firearm found at Mr. Ruiz's home. *Id*.

Regarding the admission of the photograph of the gun found in the 2008 traffic stop, the Court of Appeal held that weapons not directly used in the commission of the charged crime nonetheless may constitute relevant evidence. The court relied on *People v. Smith*, 30 Cal. 4th 581 (2003), wherein the defendant challenged the admission of a gun and ammunition belonging to him that did not match the description of the murder weapon. 30 Cal.4th at 613. *Smith* explained that the "evidence did not merely show that defendant was the sort of person who carries deadly weapons, but it was relevant to his state of mind . . . ." *Id*. Here, specifically, the 2008 traffic stop

---

[15] "Juan said Ruiz shot him, and Christian said that the person without the hat shot him; in court Christian identified [co-defendant] Hernandez as that person." *Ruiz*, 2015 WL 5725255, at *11.

was admitted to show Mr. Ruiz's later involvement in a criminal gang in 2009—*i.e.*, that he "knew that members of the gang engaged in or have engaged in criminal activity . . . ." *Ruiz*, 2015 WL 5725255, at *11.

The Court of Appeal acknowledged that the trial court has broad discretion to admit or exclude evidence, and its decision to do so cannot be disturbed unless it is arbitrary or capricious. *Id*. Because one of the special circumstances charged was Mr. Ruiz's membership in a criminal street gang, the prosecutor had to prove that Mr. Ruiz was an active participant and knew of the gang's past engagements. But the Court of Appeal expressed doubt as to "how [Mr.] Ruiz's possession of a gun is circumstantial evidence of his knowledge that members of the gang engage in criminal activity." *Id*.

Despite this, the Court of Appeal found the admission of the photograph to be harmless error. It held that "gang and gun violence permeated the facts of this case." *Id*. at 12. With the evidence of Mr. Ruiz's guilt being overwhelmingly strong due to the physical evidence and eyewitness identifications. *Id*. The court rejected Mr. Ruiz's argument that the verdicts would have been more favorable to him absent this error. *Id*.

3. <u>Analysis of Due Process Claim</u>

Mr. Ruiz argues that the evidence of the firearms was more prejudicial than probative and constituted impermissible character evidence. Pet. at 13–14. He contends the admission had a "substantial and injurious effect" on the jury's ultimate verdict. *Id*. at 14 (citing *Brecht*, 507 U.S. at 637).

The Supreme Court, however, has made "very few rulings regarding the admission of evidence as a violation of due process." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing *Williams v. Taylor,* 529 U.S. 362, 375 (2000)). "[I]t has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id*.

Mr. Ruiz's position is that the character evidence of him possessing unrelated firearms was so inflammatory that it violated the Due Process Clause. Pet. at 15. The Supreme Court has not expressed opinion on when the introduction of propensity evidence would constitute a

constitutional violation. *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991) ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."). The lack of Supreme Court precedent discussing the constitutionality of propensity evidence, thus, forecloses a finding that the Court of Appeal, here, acted objectively unreasonably. *See Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (rejecting the argument that impermissible propensity evidence violates clearly established due process rights); *Garceau v. Woodford*, 275 F.3d 769 (9th Cir. 2001) ("Supreme Court has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith.").

Moreover, regardless of the admission of arguably impermissible character evidence relating to unrelated firearms, it did not have a substantial an injurious effect on the verdict because of the abundance of inculpatory evidence in the record. As the Court of Appeal recognized, "[t]he evidence of Mr. Ruiz's guilt was overwhelming." *Ruiz*, 2015 WL 5725255, at *12. Witnesses identified Mr. Ruiz on numerous accounts with detail; officers found Mr. Ruiz's DNA in the glove associated with the shooting; surveillance video from the market confirmed Mr. Ruiz's identity, which corroborated with other identifying testimony; and the hat Mr. Ruiz was seen wearing in the market video was recovered from a backyard near the scene of the crime. *Id.*

Admission of Unconfronted Co-defendant Statements.

4. <u>Trial Court Proceedings</u>

After Mr. Ruiz and his co-defendant, Mr. Hernandez, were arrested, they were transported in a police car that recorded their conversation. RT 7819–24. At trial, the prosecution called Officer Lynd to testify about the contents of the recorded conversation. *Id.* Mr. Ruiz objected to its admission into evidence on the grounds of speculation—because the recording was inaudible at times and Officer Lynd was unable to identify the speaker(s)—and hearsay. *Id.* The trial court overruled the objections and allowed the testimony. *Id.* As such, the prosecution read the following to the jury: "I didn't say shit"; "Don't tell anybody. Don't tell your attorney. Don't tell anybody"; "hopefully, they don't have enough evidence"; and "hopefully we'll be out in a month or two." *Ruiz*, 2015 WL 5725255, at *5.

5. Appellate Court Opinion

Despite fitting these statements into hearsay exceptions under the California Evidence Code, the California Court of Appeal found Officer Lynd's inability to identify the speaker problematic. *Id*. at 13 ("without knowing who made each statement it cannot be admissible against *that* party declarant."). The court did not, however, find that the admission of this evidence fundamentally unfair to the trial. *Id*.

6. Analysis of Confrontation Clause Claim

In his petition, Mr. Ruiz argues that the admission of these statements violated his right to confront the witness, as required by the Sixth Amendment. Pet. at 16. Mr. Ruiz's position is that law enforcement "arranged for the two teenage suspects, just arrested, to be together, in custody, with a recorder running, obviously in the expectation of obtaining admissions." Traverse at 12.

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause prohibits the admission of testimonial statements unless the defendant has the opportunity to cross-examine the declarant. Not all statements made to law enforcement are testimonial, however. A statement is nontestimonial if it is "made out-of-court with a primary purpose other than prosecutorial use." *See United States v. Solorio*, 669 F.3d 943, 953 (9th Cir. 2012). If it is nontestimonial, "the admissibility of a statement is a concern of state and federal rules of evidence, not the Confrontation Clause." *Michigan v. Bryant*, 562 U.S. 344, 359 (2011).

Mr. Ruiz posits that, given the situation he was in, "no objective witness could deny that the circumstances were arranged to procure statements to be used at trial." Traverse at 12. What is missing, however, is any solicitation or questioning from the police officer that warranted these statements—*e.g.*, an interrogation. *See Davis v. Washington*, 547 U.S. 813, 822 (2006). Only statements that derive from questioning with the primary purpose of establishing or proving past events relevant for criminal prosecution are testimonial. *Id*. But here, nothing about the recorded conversation suggests that Mr. Ruiz or Mr. Hernandez had the primary purpose of establishing evidence for a later criminal trial. They were speaking to each other presumably without expectation of being overheard or recorded by law enforcement. Statements made in such circumstances do not implicate the Confrontation Clause. *See e.g.*, *United States v. Cazares*, 788

F.3d 956, 982–83 (9th Cir. 2015) (holding that a conversation between gang members about the journey of the murder weapon was not testimonial); *United States v. Berrios*, 676 F.3d 118, 127–28 (3d Cir. 2012) (holding that the secretly-recorded conversations of co-perpetrators implicating the defendants were nontestimonial); *United States v. Dale*, 614 F.3d 942, 956 (8th Cir. 2010), *cert. denied*, 131 S. Ct. 1814 (2011) (finding the defendant's secretly recorded statement to inmate was not testimonial because, "had [defendant] known the authorities were listening in, he likely would not have admitted to committing [the crimes]").

Lastly, even if evidence is admitted in violation of the Confrontation Clause, the error is subject to harmless error analysis. *See, e.g.*, *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Merolillo v. Yates*, 663 F.3d 444, 455 (9th Cir. 2011). As with the earlier arguments of erroneously admitted evidence made by Mr. Ruiz, under clearly established federal law, such an error is harmless where the reviewing court is "able to declare a belief that it was harmless beyond a reasonable doubt." *See Chapman*, 386 U.S. at 24. If a state court has determined that a Confrontation Clause error was harmless under the *Chapman* standard, then "a federal court may not award habeas relief under § 2254 unless the *harmlessness determination itself was unreasonable*." *See Ayala*, 135 S. Ct. at 2197–98 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007) ) (emphasis in original); *see also Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) ("[H]abeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner."). And if the state court's harmless determination under *Chapman* was not objectively unreasonable, then it follows that a habeas petitioner necessarily cannot satisfy the harmless-error standard for federal habeas review in *Brecht*, 507 U.S. 619. *See Robertson v. Pichon*, 849 F.3d 1173, 1189 (9th Cir. 2017).

From an objective standpoint, the California Court of Appeal could have reasonably concluded that the admission of the co-defendant statements was harmless error under *Chapman* because, as discussed in detail above, the prosecution's evidence was strong. As such, habeas relief is unwarranted because the Court of Appeal's determination was objectively reasonable when viewed with the record.

E. Cumulative Error

Finally, Mr. Ruiz contends that the state court's rejection of his cumulative error argument resulted in a denial of his Sixth Amendment right to a fair trial. Pet. at 17. The California Court of Appeal explained that because it "found none of [Mr.] Ruiz's claims of error meritorious and/or prejudicial, a cumulative error argument cannot be sustained. No serious errors occurred, which whether viewed individually or in combination, could possibly have affected the jury's verdicts." *Ruiz*, 2015 WL 5725255, at *20.

"The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (citing *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir.2007)). As there are imperfections in all trials, the cumulative effect of the errors must make the trial and sentencing "fundamentally unfair" to warrant habeas relief. *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973).

The California Court of Appeal reasonably held that, despite the potential errors, the prosecution had overwhelming evidence regarding Mr. Ruiz's guilt and his affiliation with the Norteños gang and his identification as the shooter.

Because there were no federal constitutional errors that accumulated to an unfair trial, Mr. Ruiz is not entitled to relief under the cumulative error doctrine.

## VI. CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED**.

Dated: September 11, 2019

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California